**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LANSDALE 329 PROP, LLC, <u>et al.</u>** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 20-2034** |
| **HARTFORD UNDERWRITERS** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg,   J.**                                                                                          **April 28, 2021**

<u>**MEMORANDUM OPINION**</u>

The global COVID-19 pandemic has inflicted significant financial hardships on small businesses who were forced to either close or substantially limit access to their customers.  In an effort to recoup some of their lost revenue, many of these small businesses have turned to their insurance companies seeking coverage for the losses caused by the forced suspension of business.

Plaintiffs Lansdale 329 Prop, LLC, 329 Mainlans, LLC and Lincoln Liquor LLC d/b/a Stove and Tap, and 560 Wellington Square Associates LLC d/b/a Al Pastor (collectively, "Plaintiffs") are two such businesses who are insureds through policies issued by Defendant The Hartford Financial Services Group, Inc. d/b/a The Hartford ("Defendant").  Defendant has denied Plaintiffs' claim for business interruption coverage, giving rise to this lawsuit for breach of contract and a declaratory judgment.  Hundreds of similar lawsuits have been winding their way through the state and federal courts.[1]

---

[1]   The University of Pennsylvania School of Law has been tracking these cases on a nationwide basis.  <u>See</u> https://cclt.law.upenn.edu.

Defendant moves to dismiss the Amended Complaint here under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. For the following reasons, I will grant the Motion and dismiss the Amended Complaint.

## I.    FACTUAL BACKGROUND

The following facts are set forth in Plaintiffs' Amended Complaint.[2]

### A.    <u>The Policies</u>

Plaintiffs own and operate Stove and Tap and Al Pastor, full-service restaurants with locations in Lansdale, Malvern, and Exton, Pennsylvania. To protect their businesses in case of a sudden suspension of operations for reasons outside of their control, Plaintiffs purchased three policies of Business Owner's coverage from Defendant. These policies are identified as: (1) Policy No. 13 SBA AE7GUH issued to Lansdale 329 Prop, LLC and 329 Mainlans, LLC d/b/A Stove and Tap covered the Stove and Tap restaurant located at 329 Main Street, Lansdale, Pennsylvania 19446 ("Lansdale Stove and Tap"); (2)  Policy No. 13 SBA AE7BT5 issued to Lincoln Liquor, LLC d/b/a Stove and Tap covered the Stove and Tap restaurant located at 245 Lancaster Avenue, Malvern, Pennsylvania 19355 ("Malvern Stove and Tap"); and (3) Policy No. 13 SBA AE7DD7 issued to 560 Wellington Square LLC d/b/a Al Paster covered the Al Pastor restaurant located at 560 Wellington Square, Exton, Pennsylvania 19341 ("Al Pastor"). All three policies' coverage periods run from December 16, 2019 to December 16, 2020. (Am. Compl. ¶¶ 1, 2, 13–15.)

---

[2]      In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), I must accept all factual allegations in the operative complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. <u>Atiyeh v. Nat'l Fire Ins. Co. of Hartford</u>, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

Pursuant to the "Special Property Coverage Form" (Form SP 00 00 1018), the policies all cover "direct physical loss of or direct physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss."  "Covered Cause of Loss" means "direct physical loss or direct physical damage unless the loss or damage is excluded or limited in this Coverage Part." Each policy also included identical endorsements for "Business Income and Extra Expense" (the "Business Income endorsement") and Business Income for Civil Authority Actions (the "Civil Authority endorsement").  These endorsements extend coverage to lost business income, normal operating expenses incurred (including payroll expenses), extended business income during a period of restoration, and extra expenses for expenses that would not have been incurred for the loss or damage.  (Am. Compl. ¶¶ 2, 16, 19; Compl., Ex. C ("Policy"),[3] p. 1.)

The Business Income endorsement specifically provides, in pertinent part:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration".  The suspension must be caused by direct physical loss or direct physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

(Policy at Form SP 30131018, p. 1.)

The Civil Authority endorsement states, in pertinent part:

> When a Covered Cause of Loss causes direct physical loss or direct physical damage to property other than at the "scheduled premises", we will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "civil authority period of restoration" caused by action of civil authority that prohibits access to the "scheduled premises" provided that both of the following apply:

---

[3]     The three policies at issue are attached as Exhibits B, C, and D to Plaintiff's original Complaint, but, as the terms are identical among the three policies, I refer only to the policy at Exhibit C.

3

> (a)   Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the "scheduled premises" are within that area but are not more than one mile from the damaged property; and
>
> (b)   The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Policy, at Form SP 30191018, p. 1.)

The Policy also excludes losses from "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."   (Am. Compl. ¶ 28.) Specifically, this "Virus Exclusion" states:

> We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:
> . . .
> Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(Policy, at Form SP 00001018, pp. 3–4.)

## B.   The Cause of Loss

The COVID-19 pandemic and related efforts to prevent its spread caused civil authorities nationwide to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes (the "Closure Orders").  These Closure Orders include, but are not limited to, Pennsylvania Governor Wolf's order, dated March 19, 2020, requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations.  (Am. Compl. ¶¶ 21, 23.)

Plaintiffs' businesses are not considered "essential" and, therefore, were subject to Closure Orders preventing them from operating their businesses, limiting their operations, and/or restricting use of the covered premises for their intended purpose. Plaintiffs expressly allege that there was no presence of the COVID-19 virus at their properties. Rather, according to the Amended Complaint, Plaintiffs' suspension of operations resulted solely from the Closure Orders. (Id. ¶¶ 22, 24.)

### C.   **The Lawsuit**

On April 27, 2020, Plaintiffs filed suit alleging breach of contract under both the Business Income endorsement and the Civil Authority endorsement and seeking a declaratory judgment that its business losses were covered under the pertinent policies. Plaintiffs brought these claims on behalf of themselves and all other similarly-situated businesses that were denied coverage by Defendant. Plaintiffs filed an Amended Complaint on August 14, 2020, and, on September 11, 2020, Defendant moved to dismiss all claims in the Amended Complaint.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and only a complaint that states a plausible claim for relief survives a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id. at 679.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679).  The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Iqbal, 556 U.S. at 679).

## III.   DISCUSSION

Under Pennsylvania law, the interpretation of an insurance contract is a question of law.  401 Fourth St., Inc. v. Investors Ins. Grp., 879 A.2d 166, 170 (Pa. 2005). The task of interpreting an insurance contract is generally performed by the court rather than a jury, and "[t]he purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." Id. at 171. "[A]ll provisions of an insurance contract must be read together and construed according to the plain meaning of the words involved, so as to avoid ambiguity while at the same time giving effect to all of its provisions."  Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 517 (3d Cir. 2012) (quoting Masters v. Celina Mut. Ins. Co., 224 A.2d 774, 776 (Pa. Super. 1966)).  Where no genuine issues of material fact exist and "[w]hen the language

of the policy is clear and unambiguous, a court is required to give effect to that language." 401 Fourth Street, 879 A.2d at 171.

A policy is ambiguous where it is reasonably susceptible of more than one construction and meaning. Pa. Nat'l Mut. Cas. Ins. Co. v. St. John, 106 A.3d 1, 14 (Pa. 2014) (citation omitted). It is not ambiguous, however, merely because the parties disagree about its meaning, and policy language should not be stretched beyond its plain meaning to create an ambiguity. Meyer v. CUNA Mut. Ins. Soc., 648 F.3d 154, 164 (3d Cir. 2011). "Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist." Sikrica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).

The insured bears the initial burden of establishing coverage under the policy. State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) (citations omitted). If the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the cited exclusion applies. Id.; Wolfe v. Ross, 115 A.3d 880, 884 (Pa. Super. Ct. 2015). Exclusions are strictly construed against the insurer. Selko v. Home Ins. Co., 139 F.3d 146, 152 n.3 (3d Cir. 1998). However, "[e]xclusions from coverage contained in an insurance policy will be effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import." Pacific Indem. Co. v. Linn, 766 F.2d 754, 761 (3d Cir. 1985).

Here, Defendant argues that Plaintiffs have not plausibly alleged that they suffered covered losses under the policies at issue, and, even if such losses are covered, the losses fall within the Virus Exclusion. Plaintiffs response is three-fold: (1) their losses are, in fact, covered under the

policies' terms; (2) the Virus Exclusion does not apply; and (3) the "reasonable expectations" doctrine should operate to provide coverage.

### A.   <u>Whether There Is a Covered Loss</u>

As noted above, Plaintiffs bear the burden of establishing that they suffered a covered loss under the policies.  In an effort to plead a covered loss, Plaintiffs contend that insurance coverage for their COVID-19 related losses exists under either or both of the Business Income endorsement or the Civil Authority endorsement in the policies.  Defendant challenges the existence of coverage under these endorsements.

#### 1.   <u>Business Income Endorsement</u>

Plaintiffs first posit that the policies at issue are "all-risk" policies, meaning that "the only questions which need to be decided . . . are whether [the plaintiff] has suffered a loss and, if so, whether such loss is excluded from coverage under the policy."  (Pls.' Opp'n 8 (quoting <u>Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.</u>, 866 F.2d 71, 75 (3d Cir. 1989).)  Plaintiffs reason that, the presence or threatened presence of the virus constitutes a "covered cause of loss" because there is ample support for the proposition that the threatened presence of a virus can cause "physical loss" and/or "physical damage."  (<u>Id.</u> at 10.)  In turn, they argue that any loss of business income due to the threatened presence of the virus is covered under the Business Income endorsement within the policies.  For the following reasons, I disagree with Plaintiffs' interpretation of the policies.

An "all-risk" policy is a special kind of insurance policy that "covers every kind of insurable loss except what is specifically excluded."  <u>Betz v. Erie Ins. Exch.</u>, 957 A.2d 1244, 1255–57 (Pa. Super. Ct. 2008) (quoting Black's Law Dictionary 815 (8th ed. 2004)); <u>see also</u> 10 <u>Couch on Ins.</u> § 148:50 ("A property insurance policy which covers 'physical loss or damage to property insured from any external cause' is properly construed to be an 'all-risk' policy.").

However, "[t]he term 'all-risk' has been said to be 'somewhat misleading'" as "'[a]ll-risk' is not synonymous with 'all loss.'" Intermetal Mexicana, S.A., 866 F.2d at 75.  Rather, the policy terms must be given their plain and ordinary meaning to determine whether the insured can prove that a particular loss falls within policy's coverage.  Id.

Here, the term "all-risk" appears nowhere in the policies.  Rather, the policies expressly provide that Defendant "will pay for direct physical loss of or direct physical damage to Covered Property at the premises described in the Declarations . . . caused by or resulting from a Covered Cause of Loss."  (Policy ¶ 1.)  A "Covered Cause of Loss" means *direct physical loss or direct physical damage* unless the loss or damage is excluded or limited in this Coverage Part."  (Id. ¶ 3 (emphasis added).)   The Business Income endorsement extends the available coverage by providing, in pertinent part:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration".  *The suspension must be caused by direct physical loss or direct physical damage to property* at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", *caused by or resulting from a Covered Cause of Loss.*

(Id. at Form SP 30131018, p. 1 (emphasis added).)

Thus, a plain reading of the policies—and giving effect to all of the provisions—reflects that in order for a loss to be covered, there must be a "covered cause of loss," which results in "direct physical loss or direct physical damage to property"  This phrase is crafted in the disjunctive, meaning there must either be "direct physical loss" *or* "direct physical damage to the property." Frank Van's Auto Tag, LLC v. Selective Ins. Co., No. 20-cv-2740, 2021 WL 289547, at *4 (E.D. Pa. Jan. 28, 2021).  Direct physical damage is "a distinct, demonstrable, physical alteration of the property." Newchops Restaurant Comcast LLC v. Admiral Indem. Co., Nos. 20-

cv-1949, 20-cv-1869, 2020 WL 7395153, at *5 (E.D. Pa. 2020) (quoting 10A <u>Couch on Ins.</u> §
148.46 (3d ed. 1995) (citation omitted)).   "Pure economic losses are intangible and do not
constitute property damage." <u>Id.</u> (quoting 9A <u>Couch on Ins.</u> § 129.7).   "Direct physical loss," on
the other hand, exists when a structure has been rendered "uninhabitable and unusable" and the
owner has suffered a "distinct loss."   When the "structure continues to function" there is no
physical loss that would be eligible for coverage.   <u>Port Auth. of NY and NJ v. affiliated FM Ins.
Co.</u>, 311 F.3d 226, 235 (3d Cir. 2002).

The United States Court of Appeals for the Third Circuit has expanded on these definitions
in several key cases.  In <u>Port Authority of New York and New Jersey v. Affiliated FM Insurance
Co.</u>, the Third Circuit considered an insurance claim for alleged losses due to the presence of
asbestos.  Interpreting an identical insurance provision under New Jersey and New York law, the
Court remarked that allegations of physical damage to a building from "sources unnoticeable to
the naked eye must meet a higher threshold."  <u>Id.</u> at 235.  The Court concluded that the "mere
presence of asbestos, or the general threat of future damage from that presence, lacks the distinct
and demonstrable character necessary for first-party insurance coverage." <u>Id.</u>

Subsequently, in the unpublished, but persuasive decision of <u>Motorists Mutual Ins. Co. v.
Hardinger</u>, 131 F. App'x 823, 826 (3d Cir. 2005), the Third Circuit extended the principles dictated
in <u>Port Authority</u> to the meaning of "direct physical loss" under Pennsylvania law.  <u>Id.</u> at 826.  The
insureds in that case sought insurance coverage due to the presence of bacteria in the home's well
that caused them to become sick.  <u>Id.</u> at 824.  The Third Circuit reiterated the standard set forth in
<u>Port Authority</u> and noted that, where the damage involves "sources unnoticeable to the naked eye,"
"physical loss or damage" occurs where that source nearly eliminates or destroys the property,
renders it "useless or uninhabitable," or causes "loss of utility."  <u>Id.</u> at 826 (citing <u>Port Authority</u>).

The Court found that summary judgment was inappropriate in that case because there was a genuine issue of fact as to whether the functionality of the insureds' home was nearly eliminated or destroyed, or whether property was made useless or uninhabitable by the presence of bacteria in the home.  Id. at 826–27.

In a case factually analogous to the one before me, the United States District Court for the Southern District of New York applied Pennsylvania law to address whether pure economic loss warranted coverage under a policy that required "direct physical loss." Philadelphia Parking Auth. v. Fed. Ins. Co., 385 F. Supp. 2d 280 (S.D.N.Y. 2005).  There, the operator of a parking garage at Philadelphia International Airport sustained significant economic loss following the terrorist attacks on September 11, 2001 due to the ensuing decrease in airline travel.  Id. at 282.  The plaintiff sought insurance coverage for this decrease in business.  Id.  The court declined to find coverage, holding that "the phrase 'physical loss or damage' is not ambiguous since 'reasonably intelligent [people] on considering it in the context of the entire policy would [not] honestly differ as to its meaning.'" Id. at 289 (quoting United Servs. Auto Ass'n v. Elitzky, 517 A.2d 982, 985 (Pa. Super. 1986)).  It concluded that "the phrase 'direct physical loss or damage,' when considered in the context of the Insurance Policy at issue in the present case, require[d] that claimed loss or damage must be physical in nature." Id.

Against this legal landscape, I find that "for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision," the loss (a) "must bear a causal relationship to some *physical condition* of or on the premises" and (b) "the premises must be uninhabitable and unusable, or nearly as such." Humans & Resources, LLC v. Firstline Nat'l Ins. Co., No. 20-cv-2152, 2021 WL 75775, at *7 (E.D. Pa. Jan. 8, 2021) (emphasis in original).

Numerous decisions from within this Circuit are instructive on whether the threat of COVID-19 constitutes "direct physical loss or direct physical damage to property." These decisions have uniformly concluded that such a threat does not trigger insurance coverage. See, e.g., Paul Glat MD, P.C. v. Nationwide Mut. Ins. Co., No. 20-cv-5271, 2021 WL 1210000, at *5–6 (E.D. Pa. Mar. 31, 2021); Eric R. Shantzer, DDS v. Travelers Cas. Ins. Co. of Am., No. 20-cv-2093, 2021 WL 1209845, at *4 (E.D. Pa. Mar. 31, 2021); Tria WS LLC v. Am. Auto. Ins. Co., No. 20-4159, 2021 WL 1193370, at *3–5 (E.D. Pa. Mar. 30, 2021); Chester Cty. Sports Arena v. The Cincinnati Specialty Underwriters Ins. Co., Nos. 20-cv-2021 et al., 2021 WL 1200444, at *7 (E.D. Pa. Mar. 30, 2021); Kahn v. Pa. Nat'l Mut. Cas. Ins. Co., No. 20-cv-781, 2021 WL 422607, at *6–7 (E.D. Pa. Feb. 8, 2021); Frank Van's, 2021 WL 289547, at *6–7; 1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., No. 20-cv-862, 2021 WL 147139, at *6–7 (W.D. Pa. Jan. 15, 2021); Rest. Grp v. Certain Underwriters at Lloyd's, London, No. 20-cv-2365, 2021 WL 131339, at *5–6 (E.D. Pa. Jan. 14, 2021); Ultimate Hearing Solutions II, LLC v. Twin City Fire Ins. Co., No. 20-2401, 2021 WL 131556, at *6–7 (E.D. Pa. Jan. 14, 2021); Newchops, 2020 WL 7395153, at *5; Kessler Dental Assocs., P.C. v. Dentists' Ins. Co., No. 20-cv-3376, 2020 WL 7181057, at *4 (E.D. Pa. Dec. 7, 2020); 4431, Inc. v. Cincinnati Ins. Cos., No. 20-cv-4396, 2020 WL 7075318, at *11–12 (E.D. Pa. Dec. 3, 2020); Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am., No. 20-cv-3342, 20202 WL 7024287, at *3–4 (E.D. Pa. Nov. 30, 2020); Brian Handel D.M.D., P.C. v. Allstate Ins. Co., No. 20-3198, 2020 WL 6545893, at *3 (E.D. Pa. Nov. 6, 2020).[4]

---

[4] Plaintiffs identify one Pennsylvania state court case that rejected a motion to dismiss claims for business interruption insurance due to COVID-19. In Ridley Park Fitness, LLC v. Philadelphia Indemnity Ins. Co., No. 01093 (Phila. Com. Pl. Aug. 31, 2020), the Philadelphia Court of Common Pleas, in a footnote order, declined to dismiss a complaint seeking insurance coverage for business losses at a fitness center as a result of the pandemic and the resulting closure orders. (Pl.'s Opp'n, Ex. 1.) The court provided no statement of the relevant policy provisions, thereby rendering it

I concur with my colleagues and find that Plaintiffs have not plausibly alleged either physical loss or physical damage within the meaning of the policies.  Unlike in <u>Motorist's Mutual</u>, where there were specific allegations of bacteria in the insured property, in the matter before me, Plaintiffs explicitly aver that there was "no presence of the COVID-19 virus at Plaintiffs' Covered Properties."  (Am. Compl. ¶ 24.)  Thus, contrary to the cases on which Plaintiffs rely,[5] Plaintiffs admit that there was no physical source or threatened presence of a physical source that caused Plaintiffs' inability to use their properties for their intended purpose.  Indeed, the Amended Complaint does not allege any facts regarding the physical integrity or use of the Covered Properties.

Plaintiffs' Amended Complaint alternatively alleges that the "covered causes of loss" here are the "Closure Orders" by state and local authorities, which "prevent[ed] Plaintiffs from opening

---

impossible to determine whether the policy there bore any resemblance to the policies at issue here.

By contrast, in <u>Scranton Club v. Tuscarora Wayne Mut. Grp., Inc.</u>, No. 2020-2469 at 36 (Pa. Com. Pl. Lackawanna Cnty. Jan. 25, 2021),  the Lackawanna Court of Common Pleas considered the same issue and dismissed the insured plaintiff's claims, finding that the insured had "not alleged any facts which may arguably satisfy the 'direct physical loss or damage' requirement for . . . coverage under the policy.  It also has not alleged the requisite repair, restoration, or replacement of its premises during its 'period of restoration.'"

[5]     Plaintiffs' admission that there was no presence of COVID-19 at the properties distinguishes this case from their cited cases.  <u>See</u> <u>Matzner v. Seaco Ins. Co.</u>, 96-0498-B, 1998 WL 566658, at *3–4 (Mass. Super. Ct. Aug. 12, 1998) (actual carbon-monoxide contamination); <u>Essex Ins. Co. v. BloomSouth Flooring Corp.</u>, 562 F.3d 399, 404–05 (1st Cir. 2009) (allegations that carbon monoxide odors permeated the building); <u>Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.</u>, 968 A.2d 724, 737–38 (N.J. Super. 2009) (physical damage to electrical grid which caused interruption of electrical power to supermarkets' refrigeration system for several days); <u>Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.</u>, No. 12-cv-4418, 2014 WL 6675934, at *4 (D.N.J. Nov. 25, 2014) (release of ammonia from facility's refrigeration system); <u>Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.</u>, 98 N.W.2d 260, 296  (Minn. 1959) (physical presence of smoke in insured egg and milk processing plant, caused by nearby fire, that resulted in federal government's rejection of productions due to smoke contamination).

their businesses, limiting their operations, and/or from use of the covered premises for their intended purpose." (Am. Compl. ¶ 22.)

Such Closure Orders, however, have no impact on the physical condition of the insured premises and do not make the premises either uninhabitable or unusable for their intended purpose. Reading the insurance policies to cover losses from the Closure Orders would render the policies' use of the word "physical" meaningless or superfluous. See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 428 (3d Cir. 2012) (holding that an insurance contract should not be interpreted so as to render certain words superfluous). Indeed, Pennsylvania Governor Wolf's March 19, 2020 Closure Order expressly allowed restaurants, such as those owned by Plaintiffs, to continue offering "carry-out, delivery, and drive-through food and beverage service . . . so long as social distancing and other mitigation measures are employed to protect workers and patrons." (Am. Compl. ¶ 23 (citing https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order#download).) Because the Closure Orders only limited Plaintiffs' business operations—and did not render them uninhabitable and unusable—the Closure Orders did not result in a physical loss.

Plaintiffs also assert that "Defendant cites to absolutely no Pennsylvania cases holding that an order by a civil authority cannot constitute a covered cause of loss." (Pls.' Opp'n 15.) They posit that "as the insurer of an all-risk policy, [Defendant] has the burden to show that there is no coverage." (Id. at 16.) Because the Closure Orders operated as a blockade on the normal use of the insured premises, Plaintiffs conclude that they constitute a Covered Cause of Loss.[6]

---

[6]      Plaintiffs cite to Betz v. Erie Ins. Exch., 957 A.2d 1244, 1257 (Pa. Super. Ct. 2008) for the proposition that as the insurer of an all-risk policy, Hartford has the burden to show that there is no coverage." (Pls.' Opp'n 16.) In Betz, however, the insureds had purchased "extracover insurance policy" which covered all losses unless explicitly excluded from coverage. Id. at 1250. The Pennsylvania Superior Court expressly recognized the Pennsylvania Supreme Court's

This argument improperly reverses the applicable burdens in this case.  It remains well settled that the insured bears the initial burden of establishing coverage under the policy.  State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) (citations omitted). Thus, to plausibly plead a *prima facie* claim of coverage, the burden falls on Plaintiffs to show that they suffered "direct physical loss of or damage to" their property.  See Clear Hearing Solutions, LLC v. Cont'l Cas. Co., No. 20-cv-3454, 2021 WL 131283, at *6 (E.D. Pa. Jan. 14, 2021).  As Plaintiffs have not done so, their claim must be dismissed. [7]

---

mandate that "[i]n an action based upon an 'all risks' insurance policy, the burden is upon the insured to show *that a loss has occurred*; thereafter the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion." Id. (quoting Wexler Knitting Mills v. Atl. Mut. Ins. Co., 555 A.2d 903, 905 (Pa. Super. 1989) (emphasis in original).

Here, by contrast, the policies do not cover "all losses," but rather only "direct physical loss or direct physical damage to Covered Property at the premises" and any extension of those losses set forth in the Business Income and Civil Authority endorsements.  Accordingly, the burden remains on Plaintiffs to show a "Covered Cause of Loss."

[7]     Plaintiffs cite to several out-of-circuit cases where courts have declined to dismiss insurance claims for losses due to COVID-19.  I find these cases distinguishable.  See Studio 417, Inc. v. Cincinatti Ins. Co., 478 F. Supp. 3d 794, 802 (W.D. Mo. 2020) (finding that plaintiff had plausibly pled "physical loss or damage" by expressly pleading that COVID-19 "particles attached to and damaged" their property); Urogynecology Specialist of Fl. LLC v. Sentinel Ins. Co., Ltd., No. 20-cv-1174, 2020 WL 5939172, at *4 (M.D. Fl. Sept. 24, 2020) (denying insurer's motion to dismiss premised only applicability of policy's virus exclusion; court did not address the term "physical loss" in the Business Income endorsement).

Plaintiffs also reference a decision by the New Jersey trial court, in Optical Services USA v. Franklin Mutual Insurance Co., No. BER-L-3681-20, wherein the judge denied a motion to dismiss a claim for insurance coverage resulting from the shutdown orders.  Applying New Jersey law, the court—via an oral decision—declined to find, absent further discovery, whether the loss of use of a business due to a New Jersey state order deeming all non-essential businesses unsafe constituted a direct physical loss or direct physical damage under the insurance policy.  (Pls.' Opp'n, Ex. 2.)  I disagree with this ruling because interpretation of an insurance contract is purely legal and does not require discovery.

2. <u>Coverage Under the Civil Authority Endorsement</u>

Plaintiffs next contend that even if there is no coverage under the Business Income endorsement of the policy, coverage was nonetheless extended under the Civil Authority endorsement. This endorsement states, in pertinent part:

> When a Covered Cause of Loss causes direct physical loss or direct physical damage to property other than at the "scheduled premises", we will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "civil authority period of restoration" caused by action of civil authority that prohibits access to the "scheduled premises" provided that both of the following apply:
>
> (a)   Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the "scheduled premises" are within that area but are not more than one mile from the damaged property; and
>
> (b)   The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Policy, at Form SP 30191018, p. 1.)

Plaintiffs argue that each of Civil Authority endorsement's "prongs" is adequately pled: (1) property "within one mile" of the insured premises experienced "direct physical loss or direct physical damage," (2) which caused an "action of civil authority" to "prohibit[] access" to the insured premises, and (3) "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." Plaintiffs contend that "[g]iven that the presence of the virus is a Covered Cause of Loss, the *continued* presence of the virus (which, in turn, gives rise to the continued enforcement of the Closure Orders) meets the requirements of this prong." (Pls.' Opp'n 20.)

16

The Amended Complaint here is devoid of any allegation that any property "within one mile" of the insured premises experienced any "direct physical loss or direct physical damage." See Frank Van's, 2021 WL 289547, at *7 (holding that failure to allege that other properties sustained damage is fatal to coverage under a Civil Authority provision).   Plaintiffs have specifically denied the presence of COVID-19 at their properties and have not alleged the presence of COVID-19 at any neighboring properties.   Moreover, the relevant Closure Orders were not issued in response to "dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss."   Rather, according to the allegations in the Amended Complaint, the Closure Orders were issued to *prevent* the spread of the COVID-19 virus to any of these properties. (Am. Compl. ¶ 22 ("The COVID-19 pandemic and related efforts to prevent its spread have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and prevention of citizens from leaving home for non-essential purposes (the 'Closure Orders')".)   Such allegations bring this claim outside the coverage of the Civil Authority endorsement.   See Frank Van's, 2021 WL 289547, at *7 ("[T]he orders enforced the stated need for social distancing to prevent future viral transmission. . . . But the fear of the virus in nearby properties does not establish physical damage."); Toppers, 2020 WL 7024287, at *4 (E.D. Pa. Nov. 30, 2020) ("[Plaintiff] did not close because of damage to a nearby premise or because there was some dangerous physical condition at another nearby premise.  It closed because the Shutdown Orders applied to its own operations.  Its shutdown and resulting losses fall outside the scope of the Civil Authority coverage."); Newchops Rest. Comcast, 2020 WL 7395153, at *6 (noting that "[t]he shutdown orders and accompanying proclamations were in response to the COVID-19 health crisis, not damage to any property—the insureds' or another's.").

In an effort to establish Civil Authority coverage, Plaintiffs cite to <u>Narricot Industries, Inc.</u> <u>v. Fireman's Fund Ins. Co.</u>, No. 01-4679, 2002 WL 31247972 (E.D. Pa. Sept. 30, 2002).  In that case, a hurricane struck North Carolina, causing power outages, downed radio systems, road flooding, and a flooded water treatment plant, prompting the mayor to declare a state of emergency and suspend the operation of all plants, including the plaintiff's plant.  <u>Id.</u> at *1. The plaintiff's insurer denied coverage for the resulting losses on the grounds that, because the civil authority orders were "preventative," in that they were designed to prevent damage from hurricane and flood, these orders did not result from a covered cause of loss.  <u>Id.</u> at *5.  The court rejected this argument and found that the "covered cause of loss" (hurricane or flood) was the cause of the civil authority orders and "[r]egardless of whether [the municipality] took the measures to prevent hurricane and flood damage or alleviate the perils caused by hurricane and flood damage, the measures still *resulted* from hurricane and flood."  <u>Id.</u> (emphasis in original).  Relying on this holding, Plaintiffs here argue that civil authority orders issued to prevent physical loss, such as those at issue, necessarily result from a covered cause of loss.

<u>Narricot</u> is distinguishable because a hurricane and flood (both covered causes of loss under the relevant insurance policy) actually occurred, resulting in damage to property other than the insured premises, including electrical lines, a wastewater treatment plant, and a raw water pump station.  <u>Id.</u> at *4.  Because of this damage, the municipality issued civil orders to suspend the operation of all plants, including the insured premises, to avoid further damage due to the water system being shut down.  As such, consistent with the "Civil Authority Clause" in the insurance policy, and unlike the case before me, the insured in <u>Narricot</u> had alleged a "direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any 'covered cause of loss.'"  <u>Id.</u> at *4.  The court took care to distinguish the facts at issue—where

the civil authority actions were taken *in response* to damage caused by a covered peril—from a situation where a civil authority action is used to *prevent* a covered peril.  Id. at *5.[8]

The situation here falls within that latter category because, according to the Amended Complaint, the Closure Orders were issued to *prevent* loss at both Plaintiffs' properties and other properties and were not issued in response to property damage or loss at a nearby property.[9] Accordingly, I find that the Amended Complaint fails to plausibly allege coverage under the Civil Authority endorsement.

**B.     Whether the "Virus Exclusion" Applies**

In an alternative basis for its Motion to Dismiss, Defendant argues that even if Plaintiffs could establish a covered loss under the policies, the claims are expressly barred by the "Virus Exclusion," which states, in pertinent part:

> We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

---

[8]     Plaintiffs other cited cases are similarly distinguishable.  See Assurance Co. of Am. v. BBB Serv. Co., 593 S.E.2d 7, 8 (Ga. App. 2003) (noting that insured presented evidence that actual damage caused by Hurricane Floyd to property other than the insured premises was the basis for the evacuation order that closed the insured premises); Sloan v. Phoenix of Hartford Ins. Co., 207 N.W.2d 434, 436 (Mich. App. 1973) (finding that losses caused by shutdown order during period of riots was covered where policy provided coverage for "actual loss as covered hereunder, during the period of time, not exceeding 2 consecutive weeks, when as a direct result of the peril(s) insured against [including riot], access to the premises described is prohibited by order of civil authority.").

[9]     I note the very recent opinion by the Allegheny County Court of Common Pleas, in Ungarean, DMD v. CNA, No. GD-20-006544 (Pa. Com. Pl. Allegheny Cnty. Mar. 22, 2021), which reached a different interpretation of "direct physical loss" than in Scranton Club.  Relying heavily on dictionary definitions, the court in that matter determined that business losses incurred as a result of the COVID-19 pandemic fell within the scope of the "civil authority provisions" in the insurance contract because the closure orders "effectively prohibited meaningful access to Plaintiff's property."  Id. at 18.  Aside from the fact that the civil authority coverage provision in that case is significantly different than the one at issue here, I respectfully disagree with that court's interpretation of terms such as "direct physical loss" and "period of restoration."

. . .
Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(Policy, at Form SP 30191018, p. 1.)

Defendant contends that Plaintiffs' alleged losses fall squarely within the exclusion as COVID-19 is a "virus" that is "capable of inducing physical distress, illness or disease." Defendant goes on to reason that the government order that resulted in the shutdown of Plaintiffs' restaurants were designed precisely "to prevent exposure to COVID-19" and to "help stop the spread of COVID-19." (Am. Compl. ¶¶ 3, 21, 23.)

Under Pennsylvania law, the insurer has the burden of showing that policy exclusions preclude coverage. Miller v. Boston Ins. Co., 218 A.2d 275, 277 (Pa. 1966); Am. States Ins. Co. v. Maryland Cas. Co., 628 A.2d 880, 887 (Pa. Super. 1993). Numerous courts, applying Pennsylvania law, have thoroughly addressed arguments regarding the Virus Exclusion's applicability to insurance claims based on COVID-19 shutdowns. These cases have almost unanimously concluded that the language of the Virus Exclusion unambiguously bars coverage. See, e.g., Fuel Recharge Yourself, Inc. v. Amco Ins. Co., No. 20-4477, 2021 WL 510170, at *3 (E.D. Pa. Feb. 11, 2021); Frank Van's, 2021 WL 289547, at *8; Humans & Res., LLC, 2021 WL 75775, at *8; Toppers Salon, 2020 WL 7024287, at *3; Wilson v. Hartford Cas. Co., No. 20-cv-3384, 2020 WL 5820800, at *7 (E.D. Pa. Sept. 30, 2020); see also Causeway Auto., LLC v. Zurich Am. Ins. Co., No. 20-cv-8393,2021 WL 486917, at *6 (D.N.J. Feb. 10, 2021); N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co., No. 20-cv-05289, 2020 WL 6501722, at *5 (D.N.J. Nov. 5, 2020); Edison Kennedy, LLC v. Scottsdale Ins. Co., No. 20-cv-1416, 2021 WL 22314, at *8 (M.D. Fl. Jan. 4, 2021).

I decline to add yet another voice to the already-saturated chorus of jurisprudence on the impact of the Virus Exclusion.  This is especially so where the applicability of this exclusion is on appeal to the Third Circuit and where precedent under Pennsylvania law is not fully developed. Having found that Plaintiffs have not plausibly pled coverage under the policies, I will dismiss their claims without independently addressing the applicability of the Virus Exclusion here.[10]

### C.    Reasonable Expectations Doctrine

In a final effort to avoid the plain language of the policies, Plaintiffs invoke Pennsylvania's reasonable expectations doctrine.  Plaintiffs argue that they purchased "all-risk" policies of insurance with business interruption coverage, including coverage from losses caused by civil authority actions.  Because other business interruption policies contained specific exclusions for the presence of viruses and for pandemics, and the policies issued by Defendant did not, Plaintiffs posit that they maintained a reasonable expectation that their policies would cover losses caused by the threatened presence of a virus or by a related closure order.  Plaintiffs further press that because an inquiry into their reasonable expectations is factual and cannot be resolved absent discovery, the Amended Complaint should not be dismissed at this stage of the proceedings.

The Pennsylvania doctrine of reasonable expectations states that "[t]he reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents."  Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1353 (Pa. 1978).  "It is intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a

---

[10]    As I do not address the application of the Virus Exclusion, I will not opine on Plaintiffs' invocation of the regulatory estoppel doctrine to avoid application of that Exclusion.

policy." UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004) (citing Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920 (Pa. 1987) ("We hold that where, as here, an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy.")).

The Third Circuit has applied this doctrine in cases "where the insured reasonably expected certain coverage, even when those expectations were in direct conflict with the unambiguous terms of the policy." Id. at 503 (citing Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303 (3d Cir.1994) (reversing dismissal of an insured's declaratory judgment action where insurer had unilaterally expanded an exclusion in a professional liability insurance policy)). Although "in most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations," the courts must nevertheless "examine the 'totality of the insurance transaction involved to ascertain the reasonable expectations of the insured." Liberty Mut. Ins. Co. v. Treesdale, Inc., 418 F.3d 330, 344 (3d Cir. 2005) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903 (3d Cir. 1997)). This aspect of the doctrine is only applied "in very limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and from insurer deception. Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 109 n.8 (Pa. 1999). Absent sufficient justification, however, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous." Treesdale, 418 F.3d at 344 (3d Cir. 2005) (quoting Frain v. Keystone Ins. Co., 640 A.2d 1352, 1354 (Pa. Super. 1994)).

Several recent cases from this Court have addressed application of the reasonable expectations doctrine in connection with a claim for insurance coverage based on Pennsylvania's

COVID-19-related Closure Orders.  In <u>Humans & Resources, LLC v. Firstline National Insurance Company</u>, No. 20-cv-2152, 2021 WL 75775 (E.D. Pa. Jan. 8, 2021), the plaintiff asserted that the insurer's "offering of the policy instilled a reasonable expectation in Plaintiff that it was paying Policy premiums for business income and extra expense coverage and that if its business was forced to shut down, that the Policy would provide coverage for business interruption."  <u>Id.</u> at *9. The plaintiff's first amended complaint specifically alleged that "Plaintiff purchased the aforementioned Policy expecting to be insured against losses, including, but not limited to, business income losses at its restaurant. . . [and] with an expectation that it was purchasing a policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiff as a result of COVID-19. . . . Plaintiff had a reasonable expectation that the Policy's business interruption coverage applied where a civil authority forced closure, thereby barring access to the business, due to an issue of public safety in the immediate area surrounding the Insured Property."  <u>Id.</u>  at *10.  Considering such allegations, the Court declined to dismiss the amended complaint, finding that the plaintiff had "plausibly allege[d] facts which could give rise to a basis to afford coverage to Plaintiff if proven."  <u>Id.</u>  As there had been no discovery on the issue, the Court denied the motion to dismiss.  <u>Id.</u>

The Court reached a different outcome in <u>Moody v. Hartford Financial Group, Inc.</u>, No. 20-cv-2856, 2021 WL 135897 (E.D. Pa. Jan. 14, 2021).  There, the plaintiff—in opposing the motion to dismiss—argued that because it specifically purchased its insurance policy with the expectation that it would have coverage in the event of business interruption, and because the insurer did not notify the plaintiff of the various provisions and exclusions that undermined such coverage, the reasonable expectations doctrine should apply.  <u>Id.</u> at *7.  The Court rejected this argument noting that plaintiff "has not pleaded facts that lead the Court to conclude that [the

insurer] or its agent 'create[d] in the insured a reasonable expectation of coverage that is not supported by the terms of the policy.'" Id. at *7 (quotations omitted). The Court went on to reason that "[although] [the plaintiff] alleges that it sought coverage for business interruption losses and that [the insurer] did not disclose that its policy excluded those losses[,] [the plaintiff] fails to assert any *change* in the policy they actually applied and paid for that they were unaware of which would justify setting aside the plain language." Id. (emphasis in original). The Court further remarked that the plaintiff had not alleged any affirmative representation by the insurer or its agents that business losses untethered to property loss or damage would be covered. Id. Accordingly, the Court declined to apply the reasonable expectations doctrine. Id.

The case before me is more akin to Moody than to Humans & Resources. Here, Plaintiffs originally filed their Complaint on April 27, 2020 but did not allege any facts to support application of the "reasonable expectations" doctrine. In its first motion to dismiss, Defendant set forth substantially the same grounds raised in the current motion. Thereafter, on August 14, 2020, Plaintiffs filed an Amended Complaint, yet still failed to include any allegations about either Defendant's representations regarding the policies' scope of coverage or Plaintiffs' expectations as to what the policies covered. Only in response to the Motion to Dismiss the Amended Complaint did Plaintiff first raise a reasonable expectations argument. Even that brief, however, failed to identify facts that could support application of the doctrine.

As Plaintiffs' Amended Complaint does not plausibly plead that they reasonably expected coverage of the losses at issue, I am not inclined to allow for a second amendment of the Complaint to allow Plaintiffs to devise a new theory of coverage.[11] "Discovery is not intended as a fishing

---

[11]    In Frank Van's Auto Tag, LLC v. Selective Insurance Company of the Southeast, No. 20-cv-2740, 2021 WL 289547 (E.D. Pa. 2021), the Court found that although the complaint did not adequately plead a "reasonable expectations" theory, "[t]here may well be a potentially meritorious

expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action." Zuk v. Eastern Pa. Psychiatric Inst. of Med. College of Pa., 103 F.3d 294, 299 (3d Cir. 1996). Plaintiffs have offered no basis in fact for their "reasonable expectations" argument other than their general argument, in response to the current Motion to Dismiss, that they believed their policies covered "all risks." Accordingly, I find that leave to amend would be futile.

## IV.   CONCLUSION

I am fully aware that my ruling may unfortunately present an obstacle in the path to recovery for Plaintiffs' businesses. That said, I must, of course, reach the result that is consistent with the insurance contracts at issue and applicable jurisprudence. As such, for all the foregoing reasons, I will dismiss the Amended Complaint with prejudice.

An appropriate Order follows.

---

amendment as to [the plaintiff's] reasonable expectations of the Policy's scope of coverage. It is yet unclear whether [the plaintiff] purchased the Policy with an expectation that it would be covered for losses of the sort it sustained due to the shutdown orders." Id. Recognizing that a curative amendment of the pleadings should be liberally allowed, the court dismissed the complaint without prejudice and gave plaintiff leave to file a first amended complaint. Id. at *10.

Here, by contrast, Plaintiffs have already amended their Complaint once in response to a motion to dismiss by Defendant yet failed to include any allegations on which to premise invocation of the reasonable expectations doctrine.